# In the United States Court of Federal Claims

|  |  |
|---|---|
| LABORANT, LLC, )<br>  )<br>Plaintiff, )<br>  )<br>v. )<br>  )<br>UNITED STATES OF AMERICA, )<br>  )<br>Defendant. )<br>  ) | No. 24-1432<br>(Filed: February 10, 2026) |

Aaron P. Silberman and Timothy A. Wieroniey, Rogers Joseph O'Donnell, P.C., San Francisco, CA, for Plaintiff.

Galina I. Fomenkova, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, with whom were Corinne A. Niosi, Assistant Director, Patricia M. McCarthy, Director, and Brett A. Shumate, Assistant Attorney General, for Defendant. Mitchell Zeff, Senior Litigation Attorney, National Complex Litigation & Investigations Division, Office of General Counsel, U.S. Department of Health & Human Services, Washington, DC, Of Counsel.

## OPINION AND ORDER

**KAPLAN, Judge.**

Plaintiff, Laborant, LLC ("Laborant"), is a private health care provider. Between February 2020 and March 2022, Laborant participated in a COVID-19 claims reimbursement program administered by the Health Resources and Services Administration ("HRSA"), a component of the Department of Health and Human Services ("HHS").[1] Under the Program, the government reimbursed health care providers at Medicare rates for administering COVID-19 tests and related services to uninsured individuals.

Originally, providers had 365 days from the date of service to file claims for reimbursement. On March 15, 2022, however, HRSA set a new deadline one week later, requiring all participants—regardless of service date—to submit any claims for testing and treatment services by March 22, 2022. HRSA explained that it would not reimburse claims submitted after that date due to insufficient program funds.

---

[1] The official title of the program is the "COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment and Vaccine Administration for the Uninsured Program." In this opinion, the Court refers to this program as "the Uninsured Program" or "the Program."

In this action, Laborant seeks compensation for HRSA's alleged failure to approve 9,149 reimbursement claims which Laborant alleges it filed by the accelerated deadline. In Count I of its Amended Complaint, Laborant alleges the government breached an implied-in-fact contract when it failed to reimburse Laborant's timely-submitted claims. Am. Compl. ¶¶ 35–49, ECF No. 15. In Count II, Laborant claims the government's acceleration of the filing deadline constituted a breach of the implied covenant of good faith and fair dealing. Id. ¶¶ 50–58. Finally, in Count III, Laborant asserts that by not providing reimbursement for the claims, the government violated provisions of certain COVID-related funding statutes and/or the "regulatory framework" HRSA employed under the Uninsured Program. Laborant requests an award of approximately $2,384,515 in damages for these alleged breaches and violations. Id. ¶¶ 59–65.

Currently before the Court is the government's Motion to Dismiss Laborant's Amended Complaint. See Def.'s 2d Mot. to Dismiss at 1, ECF No. 18 [hereinafter Def.'s Mot.]. The government contends Counts I and II should be dismissed because Laborant failed to state a claim for breach of an implied-in-fact contract or for a breach of the implied covenant of good faith and fair dealing. See id. at 17. It argues Count III should be dismissed for lack of jurisdiction because Laborant failed to establish that the COVID-related statutes that funded the Uninsured Program, in combination with what Laborant calls the Program's "regulatory framework," are money mandating and can be fairly interpreted as mandating the government compensate Laborant for the damages it sustained. See id. at 12–17.

For the reasons set forth below, the Court finds the facts alleged in Laborant's Amended Complaint, accepted as true, state a plausible claim for breach of an implied-in-fact contract. Therefore, the government's Motion to Dismiss as to Counts I and II under RCFC 12(b)(6) is denied. However, the Court agrees with the government that the statutes and regulatory framework establishing the Uninsured Program were not money mandating. The government's Motion to Dismiss as to Count III for lack of jurisdiction under RCFC 12(b)(1) is therefore granted.

## BACKGROUND[2]

### I.  Statutory Basis of the Uninsured Program

On January 31, 2020, the Secretary of HHS declared the spread of COVID-19 a public health emergency. Am. Compl. ¶ 2; Exec. Order No. 13,987, 3 C.F.R. 416 (2022). Some six

---

[2] The facts set forth in this Opinion are based on the allegations in Laborant's Amended Complaint, which the Court accepts as true for purposes of resolving the government's Motion. The Court has also considered the Program's documents and other materials included in the Appendix to the government's Motion to Dismiss, as well as online materials published by HRSA, all of which are integral to or referenced in Laborant's Amended Complaint. See Rocky Mountain Helium, LLC v. United States, 841 F.3d 1320, 1325–26 (Fed. Cir. 2016); Tellabs, Inc. v. Makor Issues & Rights, Ltd, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and

weeks later on March 13, 2020, the President issued a Proclamation declaring the COVID-19 outbreak in the United States a national emergency. Proclamation No. 9994, 85 Fed. Reg. 15337 (Mar. 13, 2020).

In response to these emergency declarations, Congress passed a series of supplemental appropriation bills to provide funding to combat the virus through increased testing, treatment, and eventually vaccination. One such measure, the Families First Coronavirus Response Act ("FFCRA"), made emergency supplemental appropriations for fiscal year 2020 and earmarked $1 billion "to pay [] the claims of providers for reimbursement . . . for health services consisting of SARS-CoV-2 or COVID-19 related items and services." Id. ¶ 4 (quoting Pub. L. No. 116-127, div. A, tit. V, para. 2, 134 Stat. 178, 182 (2020)). Additional funds were also provided by the Paycheck Protection Program and Health Care Enhancement Act ("Paycheck Protection Program Act"). Pub. L. No. 116-139, div. B, tit. I, para. 2, 134 Stat. 620, 623–27 (2020). That Act appropriated $25 billion, "to remain available until expended," for various COVID-19 testing expenses, including "up to" $1 billion which "may be used to cover the cost of testing for the uninsured." Id.

Further, Congress provided funding specifically to reimburse health care providers for expenses and lost revenues in the Coronavirus Aid, Relief and Economic Security Act ("CARES Act"). Pub. L. No. 116-136, div. B, tit. VIII, para. 18, 134 Stat. 281, 563–64 (2020). That Act appropriated $100 billion "to remain until expended to prevent, prepare for, and respond to coronavirus, domestically or internationally, for necessary expenses to reimburse, through grants or other mechanisms, eligible health care providers for health care related expenses or lost revenues that are attributable to coronavirus." Id. at 563; see Elayne J. Heisler, Cong. Rsch. Serv., R46897, The Provider Relief Fund: Frequently Asked Questions 9–10 (2022).

The CARES Act further directed the Secretary of HHS to "review applications and make payments under this paragraph in this Act" "on a rolling basis," defining "payment" to include "pre-payment, prospective payment, or retrospective payment, as determined appropriate by the Secretary." CARES Act, div. B, tit. VIII, para. 18, 134 Stat. at 563. The Act, however, also imposed limitations on this use of appropriated funds. For example, it specified that funds could not be used "to reimburse expenses or losses that have been reimbursed from other sources or that other sources are obligated to reimburse" and required payment recipients to "submit reports," and it "maintain documentation" as necessary to ensure compliance with statutory conditions. Id.

Finally, section 2401(a) of the American Rescue Plan Act of 2021 ("ARPA") appropriated $47.8 billion "to remain available until expended, to carry out activities to detect, diagnose, trace and monitor SARS-CoV-2 and COVID-19 infections and related strategies and activities to mitigate the spread of COVID-19." Pub. L. No. 117-2, § 2401, 135 Stat. 4, 40. Consistent with this broad authorization, the Secretary exercised his discretion to allocate a portion of these appropriations to the Uninsured Program even though ARPA did not explicitly

---

matters of which a court may take judicial notice." (citing 5B Wright & Miller § 1357 (3d ed. 2004 and Supp. 2007))).

earmark funds to reimburse health care providers for services for uninsured individuals. Def.'s Mot. at 9.

## II.   Features of the Uninsured Program

HHS assigned HRSA responsibility for developing and administering the Uninsured Program. Am. Compl. ¶ 6; Def.'s Mot. at 1. HRSA, in turn, contracted with Optum, a division of UnitedHealth Group, to manage the enrollment and reimbursement process. See FAQs for COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment and Vaccine Administration, Health Res. & Servs. Admin., https://www.hrsa.gov/provider-relief/about/covid-uninsured-claim/faq [https://perma.cc/MV74-FZBF] (last visited Jan. 30, 2025) [hereinafter "FAQs"]; Am. Compl. ¶ 19; App. to Def.'s Mot. at A35, ECF No. 18-1 [hereinafter Def.'s App.]; HRSA COVID-19 – Get Started, Health Res. & Servs. Admin., https://coviduninsuredclaim.linkhealth.com/get-started.html [https://perma.cc/2BM4-58QP] (last visited Jan. 29, 2026).

Providers planning to participate in the Uninsured Program were required to enroll via a portal administered by Optum. Def.'s App. at A46–50. The process involved registering for an Optum ID, supplying a Taxpayer Identification Number, submitting a provider roster, and setting up direct deposit. Id.; Am. Compl. ¶¶ 20–22. Once enrolled, providers submitted patient rosters, which Optum reviewed to verify patients lacked health insurance. Def.'s App. at A38, A52; HRSA COVID-19 – Patient Details, Health Res. & Servs. Admin., https://coviduninsuredclaim.linkhealth.com/patient-details.html#step1 [https://perma.cc/72S2-M8JD] (last visited Jan. 29, 2026). Optum administered the claims reimbursement portal. See FAQs supra; Am. Compl. ¶ 19; Def.'s App. at A35.

HRSA publicized the features and requirements of the Uninsured Program through webinars, PowerPoint presentations, and other materials published on its website. See Def.'s App. A1–99; see Am. Compl. ¶ 63. It also made promotional videos that it posted on its YouTube channel. See, e.g., HRSAtube, The COVID-19 Uninsured Program Overview (YouTube Apr. 26, 2020), https://youtu.be/MZZGV9ZN7bk.

HRSA advised health care providers that by enrolling in the Uninsured Program, they could request reimbursement for services provided on or after February 4, 2020. Am. Compl. ¶ 23; Def.'s App. at A3, A7. It further explained that participating providers whose claims were approved would be "reimbursed generally at Medicare rates, subject to available funding." Def.'s App. at A18. Indeed, in one of its promotional videos, HRSA advised health care providers to "rest assured that you will be paid, generally at Medicare rates, under this electronically-administered program." HRSAtube, supra, at 00:56–01:07.

To participate in the Uninsured Program, health care providers were required to attest to certain "Terms and Conditions." Def.'s App. at A18–19; see Am. Compl. ¶¶ 24–25. Among these was a promise not to engage in "balance billing" or "charge any type of cost sharing for any items or services provided to Uninsured Individuals who receive covered services." Def.'s App. at A90; see id. at A11, A18–19, A66, A98. Participants were also required to agree to consider "[p]ayment received from the Uninsured Program Fund to be payment in full." Id. at A90; see id. at A66, A98.

4

In addition, providers were asked to confirm that they understood "that reimbursement [was] subject to available funding for the program." Id. at A98–99. They consented to public disclosure of the payments they received under the Program. Id. at A65, A77, A88. They agreed to provide HHS with reports detailing, among other things, "the amount of funds received that were expended or obligated for each project or activity," "a detailed list of all projects or activities for which the funds were expended or obligated," and an estimate of the number of jobs created or retained by the project or activity." Id. at A65, A77, A89. Further, participants agreed to abide by the general statutory limitations applicable to expenditures of grant money and other appropriated funds. See id. at A66–72, A90–94.

The Terms and Conditions also addressed the Secretary's reimbursement obligation. It stated that "the Secretary will reimburse the [health care provider] generally at 100 percent of Medicare rates . . . for the items and services that [it] provided to Uninsured Individuals for which the [health care provider] submits claims to the Uninsured Program Fund unless otherwise noted," and "if there is no Medicare standard rate, a calculated average will be used." Id. at A78; see A66, A89; see also A21–23 (Program FAQs outlining rates of reimbursement).

The Terms and Conditions stated that compliance with its requirements would be "material to the Secretary's decision to disburse funds," and a recipient's "non-compliance with any Term or Condition and all applicable statutes and regulations may result in administrative, civil and/or criminal action being taken" and could be "grounds for the Secretary to recoup some or all of the payment made. Id. at A63, A76, A87.

### III. Laborant's Participation in the Program

Laborant enrolled in the Uninsured Program in December 2020. Am. Compl. ¶ 24. It began providing COVID-19 testing services to uninsured individuals in April 2021. Id. ¶ 26. Laborant alleges that from late 2021 to early 2022, it provided COVID-19 tests to as many as 1,100 uninsured individuals each day. Id. ¶ 27. And over the entire period that Laborant participated in the Uninsured Program, the government, applying Medicare rates as promised, paid Laborant approximately $600,000 for the services it supplied to uninsured patients. See id. ¶ 46; Health Res. & Servs. Admin., Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment, and Vaccine Administration of the Uninsured, Ctrs. for Disease Control & Prevention (Mar. 3, 2022), https://data.cdc.gov/d/rksx-33p3 [https://perma.cc/6U8B-GY4Y] (dataset listing provider reimbursements under the Uninsured Program).

As noted above, on or about March 15, 2022, HHS announced it would end the Uninsured Program due to a lack of funds. Compl. ¶¶ 29–30; FAQs supra; see About the Program, Health Res. & Servs. Admin., https://www.hrsa.gov/provider-relief/about/covid-uninsured-claim [https://perma.cc/HP5N-6X7B] (Sept. 2025). In light of this, HRSA set March 22, 2022 at 11:59 PM as the deadline for providers to submit any remaining claims for COVID-19 testing or treatment. Am. Compl. ¶¶ 29–30; About the Program, supra.

Laborant alleges that notwithstanding the accelerated deadlines HRSA imposed, it "submitted almost all of its claims on time." Am. Compl. ¶¶ 31, 47–48. Laborant further alleges the government incorrectly concluded the claims were not timely filed, and it "persist[ed] in this

5

position even after Optum allegedly "confirmed that the claims were, in fact, received on March 22, 2022." Am. Compl. ¶¶ 47–48; see also id. ¶¶ 32–34.

The government did not pay Laborant's outstanding claims for reimbursement. Id. ¶ 34. Then in June 2023, more than fourteen months later, Congress rescinded all unobligated funds still in the Uninsured Program. See Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, div. B, tit. I, 137 Stat. 10, 23–24. As a result, HRSA and HHS discontinued the Program, and HRSA announced "no additional claims payments [would] be made under the Uninsured Program." About the Program, supra.

## IV. This Action

On September 13, 2024, proceeding pro se, Mariia and Vladimir Demianchenko, the owners of Laborant, filed a Complaint on its behalf. See Compl. ¶¶ 1–2, ECF No. 1. The government moved to dismiss, arguing the Demianchenkos were not proper parties in interest, and pursuant to RCFC 7(b) and 83.1(a)(3), they could not represent Laborant because it was a corporate entity. See Def.'s 1st Mot. to Dismiss at 2–3, ECF No. 6. The government's motion subsequently became moot when the Demianchenko's secured counsel.[3] Order at 1, Feb. 2, 2025, ECF No. 13.

On May 27, 2025, the government filed its second Motion to Dismiss, which is now pending before this Court. See ECF No. 18. Laborant filed its Response on June 24, 2025, and the government filed its Reply on August 8, 2025. See Pl.'s Resp. to Mot. to Dismiss, ECF No. 19; Def.'s Reply in Supp. Mot. to Dismiss, ECF No. 23 [hereinafter Def.'s Reply]. On December 5, 2025, the parties filed simultaneous supplemental briefs at the Court's direction. Def.'s Suppl. Br. Regarding Portland Mint, ECF No. 25 [hereinafter Def.'s Suppl. Br.]; Pl.'s Suppl. Br., ECF No. 26. The Court held oral argument on December 10, 2025. See Min. Entry (Dec. 10, 2025).

## DISCUSSION

### I. Motion to Dismiss Counts I and II under RCFC 12(b)(6)

#### A. Standard

When considering a motion to dismiss for failure to state a claim upon which relief may be granted under RCFC 12(b)(6), the court "must accept as true all the factual allegations in the complaint" and "indulge all reasonable inferences in favor of the non-movant." Fishermen's Finest, Inc. v. United States, 59 F.4th 1269, 1274 (Fed. Cir. 2023) (quoting Conti v. United States, 291 F.3d 1334, 1338 (Fed. Cir. 2002)). The Court is not required, however, to "accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994) (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)).

---

[3] See also Order at 1, Apr. 15, 2025, ECF No. 17 (directing Clerk of Court to update the case caption).

"A trial court should not dismiss a complaint for failure to state a claim unless it is 'beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief.'" Sommers Oil Co. v. United States, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (quoting Hamlet v. United States, 873 F.2d 141 (Fed. Cir. 1989)). To survive a motion to dismiss under RCFC 12(b)(6), "a party need only plead 'facts to state a claim to relief that is plausible on its face,' with facts sufficient to nudge 'claims across the line from conceivable to plausible.'" TrinCo Inv. Co. v. United States, 722 F.3d 1375, 1380 (Fed. Cir. 2013) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim is plausible on its face when 'the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

### B. Implied-In-Fact Contracts

As noted above, Laborant alleges it was a party to an implied-in-fact contract with the United States under which the government promised to reimburse Laborant at Medicare rates for providing COVID-19 testing services to the uninsured. See Am. Compl. ¶¶ 35–49. Further, Laborant contends that in exchange for that promise, it agreed to comply with the Uninsured Program's Terms and Conditions, including the condition that—where Laborant received reimbursement from the government—it would accept the reimbursed amount as payment in full and refrain from balance billing. Id. ¶ 8; Def.'s App. at A66, A78, A90.

Implied-in-fact contracts are "founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." Hercules Inc. v. United States, 516 U.S. 417, 424 (1996) (quoting Balt. & Ohio R.R. Co. v. United States, 261 U.S. 592, 597 (1923)); see also Portland Mint v. United States, 102 F.4th 1371, 1378 (Fed. Cir. 2024) (same). "[T]he requirements for an implied-in-fact contract are the same as for an express contract; only the nature of the evidence differs." Hanlin v. United States, 316 F.3d 1325, 1328 (Fed. Cir. 2003). A plaintiff must prove "(1) mutuality of intent to contract; (2) offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States." Columbus Reg'l Hosp. v. United States, 990 F.3d 1330, 1339 (Fed. Cir. 2021) (Hometown Fin., Inc. v. United States, 409 F.3d 1360, 1364 (Fed. Cir. 2005); Sommers Oil, 241 F.3d at 1378 (citing Trauma Serv. Group v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997); City of El Centro v. United States, 922 F.2d 816, 820 (Fed. Cir. 1990)); Russel Corp. v. United States, 210 Ct. Cl. 596, 609 (1976), cert. denied, 429 U.S. 1073 (1977).

On the government's Motion to Dismiss Counts I and II of Laborant's Amended Complaint, the issue before the Court is whether the facts alleged are sufficient to state a claim for breach of an implied-in-fact contract. For the reasons set forth below, the Court finds that they are and so denies the government's Motion to Dismiss as to Counts I and II.

#### 1. Mutuality of Intent to Contract and Objective Evidence of an Offer and Acceptance

Mutuality of intent to contract is "a threshold condition for contract formation." Anderson v. United States, 344 F.3d 1343, 1353 (Fed. Cir. 2003) (citing Restatement (Second) of Contracts § 18 (A.L.I. 1981) [hereinafter Restatement]). A party must identify "an objective

7

manifestation of voluntary, mutual assent" to enter a binding contract. Id.; see also Columbus Reg'l Hosp., 990 F.3d at 1339 (explaining proof of the element requires "objective evidence of the parties' intent to be bound"). Put another way, "a plaintiff must show, by objective evidence, the existence of an offer and a reciprocal acceptance." Anderson, 344 F.3d at 1353 (citing Est. of Bogely v. United States, 514 F.2d 1027, 1032 (Ct. Cl. 1975)).

An offer is "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Id. (quoting Restatement § 24); Chattler v. United States, 632 F.3d 1324, 1330 (Fed. Cir. 2011) (quoting Cutler-Hammer, Inc. v. United States, 441 F.2d 1179, 1183 (Ct. Cl. 1971)). Acceptance is a "manifestation of assent to the terms [of the offer] made by the offeree in a manner invited or required by the offer." Anderson, 344 F.3d at 1353 (quoting Restatement § 50(1)).

Laborant's allegations, taken as true, are sufficient to support its claim that the government made an offer to reimburse it at Medicare rates if it provided covered services to uninsured individuals in compliance with the Terms and Conditions of the Uninsured Program. They are also sufficient to show Laborant accepted the government's offer in the manner the government required when Laborant enrolled in the Program, expressly agreed to its Terms and Conditions, performed covered services, and filed claims for payment.

The Court is not persuaded by the government's contention that the facts as pled by Laborant "at best" reflect that HRSA was "inviting health care providers generally to submit applications that if approved, and funds were available, could result in payment." Def.'s Mot. at 18. The Program materials plausibly reflect a commitment (subject to the availability of funding) to pay Program enrollees that performed covered services, complied with its Terms and Conditions, and filed timely claims for reimbursement. In fact, Laborant alleges HRSA and HHS told companies that "[i]f you are providing COVID-19 testing or treatment to uninsured individuals, rest assured that you would be paid." Am. Comp. ¶ 37. See HRSAtube, supra, at 00:56–01:03. And the parties' course of dealing reflect that the government routinely paid Laborant once it submitted claims. See Am. Compl. ¶ 46. Indeed, the allegations in the Amended Complaint suggest the only reason the government did not reimburse Laborant here was because of the government's view that Laborant's claims were not timely filed. See Am. Compl. ¶ 48.

The government cites Cutler-Hammer, Inc. v. United States in support of its argument that HRSA merely invited providers to submit requests for reimbursement that it might or might not approve, irrespective of whether program requirements were satisfied. Def.'s Reply at 6–7 (citing 441 F.2d at 1182). In that case, the Department of Treasury issued a regulation inviting interested parties to apply to purchase silver at specified prices from the federal government. Cutler-Hammer, 441 F.2d at 1180. After the Treasury Department failed to act on their purchase applications, the plaintiffs filed suit alleging a breach of an implied-in-fact contract. Id. They argued the regulation constituted an offer to sell silver that they accepted when they filed applications to purchase. Id. at 1182. In the alternative, they argued that the applications they filed constituted offers that the government accepted when it acknowledged receipt. Id.

The Court of Claims rejected both theories of contract formation, finding "nothing in the language of the Regulation or the acknowledgement which could be construed as contractual in nature." Id. Specifically, it observed the regulation did not contain a promise from the

8

government to sell silver at a specified price. Id. Instead, "[p]urchasers [were] simply invited to make 'application' to buy certain quantities of silver at a price which will be not less than [the specified price]." Id. Indeed, the court observed, "[i]t requires a distortion of plain English to infer that making an application in conformity with the terms of this Regulation would constitute an acceptance of an offer whereby the United States intended to bind itself." Id. at 1183.

Cutler-Hammer does not support the government's argument that its communiques to health care providers were mere invitations to apply for reimbursement. For one thing, while the Terms and Conditions contain one reference to "application for the Payment," the Uninsured Program is otherwise consistently described—including in its official title—as one for the reimbursement of "Claims." The noun "claim" implies the assertion of an entitlement, in this case a contractual right. Contrast Claim, Black's Law Dictionary (12th ed. 2024) (defining a "claim" as "[t]he assertion of an existing right; any right to payment or to an equitable remedy") with Application, Black's Law Dictionary (12th ed. 2024) (defining an "application" as a "request or petition"). Moreover, the language of the Uninsured Program's Terms and Conditions, unlike that of the Treasury Regulation in Cutler-Hammer, is contractual in nature. The Terms and Conditions require health care providers to comply with a series of requirements in exchange for reimbursement.

The Court concludes, therefore, that the facts as alleged by Laborant, plausibly state claims that: (1) the Uninsured Program operated as an offer by HRSA to reimburse health care providers at Medicare rates under the Program's Terms and Conditions and (2) Laborant accepted the offer by affirmatively agreeing to the Terms and Conditions, performing covered services, and submitting timely claims for reimbursement. Laborant has therefore alleged sufficient facts to support the existence of mutual intent to contract, as well as offer and acceptance.

### 2. Consideration

Consideration exists where there is a "detriment incurred by the promisee, or a benefit received by the promisor at the request of the promisor." Est. of Bogley, 514 F.2d at 1033 (quoting 1 Samuel Williston & Walter H.E. Jaeger, A Treatise on the Law of Contracts § 102 (3d ed. 1957)). "To constitute consideration, a performance or a return promise must be bargained for." Restatement § 71(1). Performance is bargained for "if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise." Steinberg v. United States, 90 Fed. Cl. 435, 444 (2009) (citing Restatement § 71(2)). The bargained-for performance may be "(a) an act other than a promise, or (b) a forbearance, or (c) the creation, modification, or destruction of a legal relation." Restatement § 71(3).

Laborant's allegations suffice to show the existence of consideration under these standards. It claims the government promised it would reimburse health care providers like Laborant at Medicare rates in exchange for Laborant undertaking the actions specified in the Uninsured Program's Terms and Conditions, subject to the availability of funds. Am. Compl. ¶ 37. Those actions included, among others, providing uninsured individuals with COVID-19 testing services. Id. The services were bargained for because the government sought them in exchange for its reimbursement promise, and Laborant provided them in exchange for that promise. See id. ¶¶ 43, 45.

Laborant's allegations also suffice to support a claim that the government bargained for a forbearance—i.e., that Laborant would not exercise its otherwise existing right to charge or balance bill the uninsured individuals to whom it provided the testing services. See id. ¶¶ 8, 43, 45; see also Def.'s App. at A66, A78, A90 (provisions of the Terms and Conditions). As noted above, a bargained-for forbearance is as much consideration as a bargained-for action. See Restatement § 71(3).

Moreover, the Program conferred a variety of benefits on the government. HRSA dubs itself as "the primary Federal agency for improving access to health care services for people who are uninsured, isolated or medically vulnerable." See Agencies – Health Resources and Services Administration, Fed. Reg., https://www.federalregister.gov/agencies/health-resources-and-services-administration [https://perma.cc/CUG5-CQTW] (last visited Feb. 2, 2026). Incentivizing Laborant and other health care providers to conduct COVID-19 tests on uninsured individuals, who might otherwise have been unable to afford those services, promoted the accomplishment of HRSA's mission. It also enabled HRSA to satisfy Congress' intent under the CARES Act and related legislation to employ reimbursement as a tool to fight the spread of the virus. See Pub. L. No. 116-136, div. B, tit. VIII, para. 18, 134 Stat. 281, 563 (2020) (appropriating $100 billion "to remain available until expended, to prevent, prepare for, and respond to coronavirus, domestically or internationally, for necessary expenses to reimburse, through grants or other mechanisms, eligible health care providers for health care related expenses or lost revenues that are attributable to coronavirus").

Moreover, the Uninsured Program's Terms and Conditions, which HRSA set and to which Laborant agreed, provided other more concrete benefits to the government. They required Laborant to maintain appropriate records and documentation; submit reports to the Secretary, which he determined were needed to ensure compliance with Program requirements; and cooperate in any audit conducted by the Secretary or the Inspector General. Def.'s App. at A65, A89, A98–99. Laborant also agreed to honor restrictions imposed on how the funds it received could be used. See, e.g., id. at A90–96.

These benefits to the government were also sufficient to supply consideration for its reimbursement promises. See Columbus Reg'l Hosp., 990 F.3d at 1340 (holding that a grant agreement between the Federal Emergency Management Agency and the State of Indiana was supported by consideration where the State "agreed to comply with an array of requirements attached to the receipt, use, and distribution of the grant money" and also to collect, maintain, and provide data to the government about program performance and effectiveness); Vera Inst. of Just. v. U.S. Dep't of Just., No. 25-CV-1643, 2025 WL 1865160, at *11 (D.D.C. July 7, 2025) (finding there was a benefit to the government under the reasoning of Columbus Regional Hospital where a grant agreement was "subject to dozens of 'Conditions'" and the recipient promised "to collect, maintain, and provide data to [Office of Justice Programs] about program performance and effectiveness" and "to report any fraud, waste, and abuse").

The government contends that under the reasoning of the court of appeals in City of El Centro, 922 F.2d at 817, HHS and HRSA received no benefit from the program because they were under no legal obligation to supply uninsured individuals with COVID-19 testing services. Def.'s Mot. at 20–21. Rather, the government argues, the benefit was conferred only on the uninsured individuals Laborant tested. The government further contends the public health and

10

other benefits that flowed to it under the contract were not "sufficiently direct" to support a finding that the government's promise to reimburse was supported by consideration. Id. at 21. Both contentions lack merit.

First, City of El Centro is inapposite. In that case, a city-owned community hospital provided treatment to 14 undocumented aliens who were injured when a van they were riding in crashed while they were attempting to flee from United States Border Patrol agents. 922 F.2d at 818. El Centro alleged that before the hospital provided the treatment, its Assistant Director of Finance asked a Border Patrol employee, Agent Hernandez, who would pay for the treatment, and Hernandez responded, "me and you." Id. The Assistant Director testified she understood from her conversation with Agent Hernandez that the Border Patrol would be responsible for the costs of the hospitalization of the injured aliens. Id.

The trial court concluded that the hospital and the Border Patrol had an implied-in-fact contract under which the United States was obligated to pay for the medical services the hospital rendered. Id. The court of appeals, however, reversed. It held, among other things, that the hospital failed to establish that the government received consideration for any promise it might have made to pay for the treatment of the injured aliens. Id. at 823. The Court explained the government had neither the authority nor the statutory responsibility to care for the aliens under 42 U.S.C. § 249, as El Centro claimed. Id. And "[b]ecause the Government was not required to provide care to the aliens," the care provided by the hospital "benefited the aliens, not the Government." Id.

There are a number of material differences between this case and El Centro. First, in this case, HRSA did have the authority to incur expenses for the testing of the uninsured and was permitted to use federal funds to do so by the various appropriation acts described above. The CARES Act, for example, appropriated billions of dollars to HHS to be used to, among other things, "reimburse through grants or other mechanisms, eligible health care providers for health care related expenses or lost revenues that are attributable to coronavirus." CARES Act, div. B, tit. VIII, para. 18, 134 Stat. at 563.

Moreover, as in Columbus Regional Hospital—and unlike City of El Centro—Laborant provided an array of other services beyond the tests themselves that were beneficial to, and bargained for, by the government. As described above, these included maintaining records for the use of HHS, cooperating in audits, and honoring limitations on the use of the funds with which it was reimbursed.

There is similarly no merit to the government's argument that—even assuming Laborant's participation in the Program enabled HRSA to fulfill Congressional intent to promote testing of the uninsured as a means to protect the public health—that benefit is too indirect or generalized to constitute consideration. Def.'s Mot. at 21. That argument appears to be based largely on the court's decision in St. Bernard Parish Government v. United States, 134 Fed. Cl. 730, 734–36 (2017). In that case, the court held that a cooperative agreement with the federal government under which it would reimburse the Parish for debris-removal costs was not supported by consideration because the United States received no "direct benefit" from the work. Id. Instead, the work primarily benefitted the Parish and its residents. Id.

11

In St. Bernard Parish, the court cited a line of Claims Court decisions holding that "in the context of government contracts[,] . . . consideration must render a benefit to the government, and not merely a detriment to the contractor" because "government officials do not have authority to make contracts in which no benefit flows to the government." See Metzger, Shadyac & Schwarz v. United States, 12 Cl. Ct. 602, 605 (1987) (citing Vulcanite Portland Cement Co. v. United States, 74 Ct. Cl. 692, 705 (1932); Montefiore Hosp. Ass'n v. United States, 5 Cl. Ct. 471, 476 (1984)).

However, the Federal Circuit's jurisprudence on consideration does not endorse the St. Bernard Parish court's theory that to form a contract, the government must receive a benefit that is "direct" or otherwise tangible. Instead, the Federal Circuit has examined the directness of benefits conferred to distinguish procurement contracts, which are subject to this court's bid protest jurisdiction, from other types of arrangements, including cooperative agreements, which are not. See Hymas v. United States, 810 F.3d 1312, 1328 (Fed. Cir. 2016) (finding cooperative farming agreements "cannot be construed as procurement contracts because the agency did not intend to acquire farming 'services' for the 'direct benefit or use of the United States Government'" (quoting 31 U.S.C. § 6305(1)). It has never held a contract is not enforceable unless the benefit bestowed on the government is a "direct" or "tangible" one. In fact, the Federal Circuit has recognized that cooperative agreements and grant agreements may be enforceable so long as the elements of mutual intent to contract, offer and acceptance, consideration, and authority are met. Columbus Reg'l Hosp., 990 F.3d at 1338 (collecting cases).

In any event, even assuming the benefits conferred on the government must be "direct" to constitute consideration, Laborant has alleged facts sufficient to show that requirement has been satisfied here. Specifically, as described above, the Terms and Conditions reflect that Laborant conferred benefits on the government mirroring those the court of appeals recognized as sufficient to establish consideration in Columbus Regional Hospital. Id. at 1340.

The Court has considered the government's remaining arguments regarding consideration and finds them without merit. It concludes Laborant plausibly alleged its agreement with HRSA was supported by consideration.

### 3.     Authority to Contract

To form an enforceable contract with the United States, "the government representative whose conduct is relied upon must have actual authority to bind the government in contract." Portland Mint, 102 F.4th at 1383 (citation modified) (quoting City of Cincinnati v. United States, 153 F.3d 1375, 1377 (Fed. Cir. 1998)). It is the plaintiff's burden to establish that the government's agent had the requisite authority to contract. City of El Centro, 922 F.2d at 820 (citing Hous. Corp. of Am. v. United States, 468 F.2d 922, 925 (Ct. Cl. 1972)).

The government contends Laborant has failed to articulate facts sufficient to show that a government representative with contracting authority committed the United States to reimburse it for providing covered services to the uninsured. Def.'s Mot. at 21–22. In particular, the government complains that Laborant has not identified which specific individual at HRSA "had actual authority to bind the Government to pay the claims it seeks to recover now." Id. at 22.

The government is correct that the Amended Complaint does not identify an individual at HRSA or HHS who was responsible for entering the alleged implied-in-fact contract with Laborant nor the source of that individual's authority to do so. See Am. Compl. ¶ 44. However, to survive a 12(b)(6) motion to dismiss, the plaintiff need neither "identify and plead the particular person who approved the contractual arrangement" nor specify "the particular statute or regulation that authorized that person to commit the government in contract." Sommers Oil, 241 F.3d at 1380. Instead, it is generally "sufficient for the complaint to allege that the Government's promise was authorized by a person having legal authority to do so." Id.

Here, Laborant's allegations meet this standard. Fairly read, Laborant alleges Congress authorized HHS to use appropriated funds to reimburse health care providers, and within that general authorization, Congress gave HHS the authority to enter contracts with those providers. Am. Compl. ¶ 44. The Court is not inclined to require more specificity from Laborant at this stage of the litigation. The Court, therefore, finds that Laborant's allegations regarding authority to contract are sufficient to survive the government's Motion to Dismiss.

### C.    The Fiscal Responsibility Act of 2023

Finally with respect to Counts I and II, the government argues that "[e]ven if the Court were to conclude that Laborant had some right to compensation when the claims were submitted, the passage of the Fiscal Responsibility Act rescinding the available funding would foreclose Laborant's claims now." Def.'s Mot. at 28 (citing Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, div. B, tit. I, 137 Stat. 10, 23–24). It reasons that "HRSA repeatedly and consistently made explicit that any reimbursement through the Uninsured Program was limited to the availability of funding." Id. (citing Def.'s App. at A3, A31–62, A98–99). And, according to the government, as a result of the Act, since funding is no longer available to pay reimbursement claims, Laborant's claims must be dismissed.

The Fiscal Responsibility Act, however, rescinded only "the unobligated balances" of the appropriations allocated to the Uninsured Program. See Fiscal Responsibility Act, div. B, tit. I, 137 stat. at 23–24 (emphasis added). "An 'obligation' is a 'definite commitment that creates a legal liability of the government for the payment of goods and services ordered or received, or a legal duty . . . that could mature into a legal liability by virtue of actions on the part of the other party beyond the control of the United States.'" Me. Cmty. Health Options v. United States, 590 U.S. 296, 307–08 (2020) (quoting U.S. Gov't Accountability Off., GAO-05-734SP, A Glossary of Terms Used in the Federal Budget Process 70 (2005)). If Laborant is correct and it had a contractual right to reimbursement at the time it submitted its claims, the funds to make reimbursement payments to Laborant were obligated and thus not subject to recission. The government's arguments based on the Fiscal Responsibility Act of 2023 are thus without merit.[4]

---

[4] The government's contention that Laborant has failed to allege facts sufficient to establish a violation of the government's duty of good faith and fair dealing (Count II), is largely derivative of the arguments the Court has rejected above in connection with Count I. See Def.'s Mot. at 26–28. Therefore, the Court similarly rejects the government's Motion to Dismiss Count II, allowing Laborant the opportunity to develop Count II more fully in discovery.

## II.     Motion to Dismiss Count III

In Count III, Laborant alleges the government violated provisions of the COVID-related funding statutes and/or what it calls "the regulatory framework" HRSA used to establish and administer the Uninsured Program. Am. Compl. ¶¶ 50–58. The government has moved to dismiss Count III for lack of jurisdiction under RCFC 12(b)(1). Because neither the funding statutes nor the Program's implementing guidance supply independent money-mandating sources of law, the Court agrees with the government that it lacks jurisdiction over Count III.

### A.     Standard

When deciding a motion to dismiss for lack of subject matter jurisdiction, the court accepts as true all undisputed facts in the pleadings and draws all reasonable inferences in favor of the plaintiff. Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011). The court may inquire into jurisdictional facts that are disputed. Rocovich v. United States, 933 F.2d 991, 993 (Fed. Cir. 1991). It is the plaintiff's burden to establish the existence of jurisdiction. Id. (citing KVOS, Inc. v. Associated Press, 299 U.S. 269, 278 (1936)).

The Court of Federal Claims has jurisdiction under the Tucker Act to hear "any claim against the United States founded either upon . . . any Act of Congress or any regulation of an executive department." 28 U.S.C. § 1491(a)(1). The Tucker Act waives the sovereign immunity of the United States to allow a suit for money damages, United States v. Mitchell, 463 U.S. 206, 212 (1983), but it does not confer any substantive rights on a plaintiff. United States v. Testan, 424 U.S. 392, 398 (1976). Therefore, a plaintiff seeking to invoke the court's Tucker Act jurisdiction must identify and plead an independent source of a substantive right to damages from the United States, arising out of a statute or regulation. Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1306 (Fed. Cir. 2008). "In the parlance of Tucker Act cases, that source must be 'money-mandating.'" Fisher v. United States, 402 F.3d 1167, 1172 (Fed. Cir. 2005). A statute is money mandating for jurisdictional purposes if it "can fairly be interpreted" to require payment of damages or if it is "reasonably amenable" to such a reading. Greenlee Cty. v. United States, 487 F.3d 871, 875 (Fed. Cir. 2007) (quoting United States v. White Mountain Apache Tribe, 537 U.S. 465, 875 (2003)).

### B.     Analysis

In its Complaint, Laborant alleges that "[t]he funding scheme created by the COVID STATUTES obligated the Government to pay for validly submitted claims for services rendered to uninsured patients." See Am. Compl. ¶¶ 59–65. For example, it observes that in FFCRA Congress directed $1 billion in funds be made available "to pay the claims of providers for reimbursement . . . for health services consisting of SARS-CoV-2 or COVID-19 related items and services" for uninsured individuals. Am. Compl. ¶ 4 (quoting Pub. L. No. 116-127, div. A, tit. V, para. 2, 134 Stat. 178, 182 (2020)). It also cites to the Paycheck Protection Program Act, noting Congress appropriated funds "for necessary expenses to reimburse, through grants or other mechanisms, eligible health care related expenses or lost revenues that are attributable to coronavirus" provided that recipients of payments "shall submit reports and maintain documentation as the Secretary of Health and Human Services . . . determines are needed to

ensure compliance with conditions" set forth by the law and the Secretary. Am. Compl. ¶ 12 (quoting Pub. L. No. 116-139, div. B, tit. I, para. 1, 134 Stat. 620, 622–23 (2020)).

As the Federal Circuit has recognized, "a statute or regulation that provides for the payment of money can qualify as money mandating if the plaintiff's claim is that the statute or regulation creates a right to payment upon a showing that the plaintiff qualifies for that payment by satisfying designated statutory or regulatory requirements." Price v. Panetta, 674 F.3d 1335, 1339 (Fed. Cir. 2012) (citing Fisher, 402 F.3d at 1174–75). On the other hand, "[a] statutory or regulatory provision that grants a government official or agency substantial discretion to decide whether to expend government funds in a particular way is not considered money-mandating and does not create a cause of action that can be prosecuted under the [] Tucker Act." Id. (citing Barnick v. United States, 591 F.3d 1372, 1378 (Fed. Cir. 2010)). Moreover, since "[a]ppropriation acts, by their very nature, are generally money-authorizing, not money-mandating," they may not serve as the basis for this Court's exercise of jurisdiction under the Tucker Act. San Antonio Hous. Auth. v. United States, 143 Fed. Cl. 425, 480 (2019); see Acevedo v. United States, 824 F.3d 1365, 1368–70 (Fed. Cir. 2016) (differentiating between statutes that are "merely money-authorizing" and those that are "money-mandating"); Perri v. United States, 340 F.3d 1337, 1341 (Fed. Cir. 2003) (holding the statute creating the Department of Justice Assets Forfeiture Fund made the fund available to the Attorney General for certain law enforcement purposes at his discretion and is "a money-authorizing statute, not a money-mandating one").

The statutes upon which Laborant relies do not create a right to payment. They are money authorizing, not money mandating. They do not prescribe specific standards for determining who will be paid, under what circumstances they will be paid, or how much they will be paid. The statutes merely authorize HHS to use appropriated funds as it deems fit for a provider reimbursement program.

Nor is there any merit to Laborant's argument that "the regulatory scheme created by HRSA and HHS under the COVID-19 funding statutes, including the Terms and Conditions, the COVID-19 Uninsured Program FAQs, COVID-19 Uninsured Program Guidelines, and the COVID-19 Uninsured Program Website all created a vested right of payment for Laborant." Am. Compl. ¶ 63. Laborant's contention is based on its characterization of these elements of the Uninsured Program as "implementing regulations," but that characterization is inaccurate. The Program's Terms and Conditions, FAQs, and guidelines are not regulations promulgated in accordance with statutory authority that have the force and effect of law. Because they are "not akin to formal agency rules or binding written directives," they "cannot constitute a 'source of substantive law [that] can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained.'" See Acevedo, 824 F.3d at 1370 (alteration in original) (quoting Mitchell, 463 U.S. at 218).

## CONCLUSION

For the reasons set forth above, the government's Motion to Dismiss, ECF No. 18, is **GRANTED-in part** and **DENIED-in-part**. Count III of the Amended Complaint, ECF No. 15, is **DISMISSED** without prejudice under RCFC 12(b)(1) for lack of subject-matter jurisdiction.

The government is directed to file an Answer to the Amended Complaint by **February 24, 2026**, and the parties are directed to file a Joint Preliminary Status Report by **March 10, 2026**.

    **IT IS SO ORDERED.**

<u>s/ Elaine D. Kaplan</u>
ELAINE D. KAPLAN
Judge
